UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SAYIDEN HUSSEIN MOHAMED,

                            Plaintiff,

       v.

SERGEANT DRAKE, *et al*.,

                            Defendants.

Case No. C16-0762-RSM-MAT

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

        Plaintiff is a county prisoner who is confined at the King County Correctional Facility ("KCCF") in Seattle, Washington.  He brings this civil rights action under 42 U.S.C. § 1983 to allege violations of his constitutional rights arising out of an alleged assault by KCCF employees in April 2016.  Plaintiff identifies King County Corrections Sergeant Drake, and King County Corrections Officers Poe, Edmond, Cays and Kile, as defendants in this action.  Defendants now move for summary judgment.  Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), but has filed no response to defendants' motion.  The Court, having reviewed defendants' motion for summary judgment, and the balance of the record, concludes that defendants' motion should be granted, and that plaintiff's complaint

REPORT AND RECOMMENDATION
PAGE - 1

1    and this action should be dismissed with prejudice.

2                                   PLAINTIFF'S CLAIMS

3            Plaintiff asserts in his complaint that he was sleeping in his cell at KCCF on the afternoon

4    of April 10, 2016, when officers entered his cell and assaulted him while extracting him from the

5    cell and placing him in a restraint chair. (*See* Dkt. 9 at 3-4.) Plaintiff claims that he was punched

6    in the back and tased while lying on the bed. (*Id*. at 3.) Plaintiff further claims that when he was

7    removed from the bed he was tossed around and slammed into the ground, and that he was then

8    grabbed by the head and body-slammed into the restraint chair while naked. (*Id*.) Finally, plaintiff

9    claims that once in the restraint chair, officers "pounded on [him] repeatedly" and Sergeant Drake

10   "stomped on" his bare feet with his boots, causing pain and severe bruising to plaintiff's toenails.

11   (*Id*. at 3-4.)

12                                   BACKGROUND[1]

13           On April 9, 2016, plaintiff was arrested by the Seattle Police Department ("SPD") for

14   investigation of robbery and investigation of malicious harassment related to a string of three

15   robberies committed earlier that day. (*See* Dkt. 39-1 at 20-22, 33, 52-54.) During the last of the

16   three incidents, plaintiff punched two victims in the face, one a wheelchair bound woman who

17   sustained three fractured bones in her left cheek, a fractured left orbital socket, an eye injury, and

18   a concussion. (*See id*.) Plaintiff was transported by SPD to KCCF for booking and, upon arrival

19   at the facility, SPD requested assistance in removing plaintiff from their vehicle because plaintiff

20   was being uncooperative. (*See id*. at 21, 27-32, 54.) Corrections staff responded and plaintiff was

21   physically removed from the car when he refused repeated directives to exit on his own. (*See* Dkt.

22

23           [1] Because plaintiff has submitted no evidence in support of his claims, the factual background set forth herein
     is based solely on the evidence submitted by defendants in support of their summary judgment motion.

REPORT AND RECOMMENDATION
PAGE - 2

1   39-1 at 26-32.)

2          Once plaintiff was removed from the vehicle, he remained uncooperative, yelling

3   obscenities at officers and hindering their efforts to escort him into the facility. (*See id.*) Plaintiff

4   refused to answer any of the medical intake screening questions, and continued to physically resist

5   staff and yell obscenities during the pre-booking process. (*See id.*) After a KCCF nurse cleared

6   plaintiff to remain in the facility, he was escorted to a holding cell. (*See id.*) A forced dress-out

7   was authorized, and plaintiff was placed in psychiatric housing on 15 minute suicide checks. (*Id.*

8   at 21-22, 26-32.)

9          On April 10, 2016, plaintiff was medically cleared to move out of psychiatric housing and

10  into pre-disciplinary housing.[2] (*See* Dkt. 35 at 2; Dkt. 40-1 at 6-7.) Plaintiff, however, refused to

11  change out of the suicide smock provided in suicide watch cells and into a standard jail uniform

12  for transfer to a different housing unit. (*See* Dkt. 35 at 2; Dkt. 39-1 at 37-46.) The deck officer

13  working the unit where plaintiff was then confined contacted Acting Sergeant Michael Drake and

14  advised him of the situation. (*Id.*) Acting Sergeant Drake directed the deck officer to check with

15  the medical staff for contraindications for the use of a taser or pepper spray, and then went to speak

16  with plaintiff. (*See* Dkt. 35 at 2; Dkt. 39-1 at 38.)

17         Upon arriving at plaintiff's cell, Acting Sergeant Drake asked plaintiff if there was an issue

18  he could resolve to help with plaintiff's transfer. (Dkt. 35 at 2.) Plaintiff responded with "Fuck

19  you!" and "You can die." (*Id.*) Acting Sergeant Drake then directed plaintiff to change into his

20  jail uniform for transfer to his new housing location. (*Id.*) Plaintiff repeated the same statements

21  and remained under his blanket in his cell with his head covered. (Dkt. 35 at 2.) Acting Sergeant

22

23  ───────────────
         [2] Plaintiff was apparently infracted as a result of his behavior during the booking process. (*See* Dkt. 39-1 at
    27.)

REPORT AND RECOMMENDATION
PAGE - 3

1    Drake notified the shift commander of the situation, and the shift commander directed Acting

2    Sergeant Drake to continue with the transfer.  (*Id.*)

3         Because of plaintiff's combative nature, and because he was to be transferred to another

4    floor within the facility, Acting Sergeant Drake made the decision to use a restraint chair for the

5    transfer as he believed it would be safer both for plaintiff and the officers transporting him.  (*Id.* at

6    3.)  After determining that there were no contraindications for the use of a taser or pepper spray,

7    Acting Sergeant Drake assembled an extraction team consisting of Corrections Officers Poe,

8    Edmond, Cays, Kile and Owens.  (*Id.*; Dkt. 36 at 2.)  Corrections Officer Poe retrieved a stun

9    shield to assist with the anticipated extraction.  (Dkt. 36 at 2.)  Plaintiff was then given one final

10   opportunity to comply with directives that he change into his jail uniform and come to the door for

11   cuffing and transfer, but plaintiff remained under his blanket and continued to curse.  (Dkt. 35 at

12   3; Dkt. 39-1 at 38.)

13        The door to plaintiff's cell was keyed open and the extraction team entered the cell.  (Dkt.

14   35 at 3.)  Officer Poe entered first and pinned plaintiff to the bed with the stun shield.  (*Id.*)  Officer

15   Cays then entered and secured plaintiff's legs.  (Dkt. 39-1 at 6.)  Officer Poe gave plaintiff multiple

16   directives to place his hands behind his back for cuffing, but plaintiff was aggressive, non-

17   compliant, and actively resisted efforts to handcuff him, thus causing Officer Poe to activate the

18   stun shield for approximately three seconds in an effort to gain compliance.  (*See* Dkt. 35 at 3; Dkt.

19   36 at 2; Dkt. 39-1 at 3.)  Plaintiff thereafter placed his hands behind his back and was cuffed.  (*Id.*)

20        Officer Kile exited the cell and brought over the restraint chair.  (Dkt. 38 at 2.)  A spit mask

21   was placed over plaintiff's head to prevent him from spitting on staff,[3] and plaintiff was then placed

22

23        [3] Plaintiff was apparently wearing a spit mask when he arrived at the facility the preceding day because he had been spitting in the back of the police car during transport.  (*See* Dkt. 39-1 at 27-32.)

REPORT AND RECOMMENDATION
PAGE - 4

1    in the chair and officers secured the restraints.  (Dkt. 35 at 4; Dkt. 36 at 2; Dkt. 37 at 2.)  Because

2    of plaintiff's combative behavior, Acting Sergeant Drake used a foot trap to prevent plaintiff from

3    kicking the officer who was bent down securing the leg restraints.  (Dkt. 35 at 4.)  According to

4    Acting Sergeant Drake, the foot trap is a low level force technique which is used for officer safety,

5    and it involved Sergeant Drake placing his own feet over plaintiff's feet in order to restrict

6    plaintiff's movement.  (*See id*.)

7          After plaintiff was placed in the restraint chair, he was transferred without incident to his

8    new housing location.  (*Id*.)  Once plaintiff arrived at his new housing location, he followed staff

9    directives and the handcuffs and the spit mask were removed.  (*Id*.)  None of the officers present

10   observed any injuries on plaintiff, and plaintiff did not indicate to officers that he was injured.  (*See*

11   *id*.; Dkt. 36 at 2; Dkt. 37 at 2; Dkt. 38 at 2.)  Plaintiff refused to answer when he was asked if he

12   wanted medical assistance.  (*See* Dkt. 35 at 4; Dkt. 36 at 2.)

13         On April 12, 2016, plaintiff submitted a medical kite in which he indicated that both of his

14   hands and his right foot were swelling, and that he had been in pain since his altercation with

15   corrections officers on April 10, 2016.  (*See* Dkt. 40-1 at 8, 15.)  Plaintiff was seen by the triage

16   nurse on April 12th and she observed no swelling in plaintiff's hands or foot, but did note that two

17   toenails on plaintiff's right foot were darkened in appearance.  (*Id*. at 8.)  Plaintiff was prescribed

18   600 mg. of ibuprofen for pain.  (*Id*. at 8, 14.)

19         On May 27, 2016, plaintiff again complained to KCCF medical staff about his black

20   toenails which he reported were the result of his altercation with officers on April 10th.  (Dkt. 40-

21   1 at 17.)  The nurse observed that the first three toenails on plaintiff's right foot were purplish in

22   color, and diagnosed plaintiff with bruised nailbeds.  (*Id*.)  There is a picture in the record before

23   the Court which confirms the appearance of plaintiff's bruised nailbeds.  (Dkt. 39-1 at 17.)

1

DISCUSSION

Summary Judgment Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are facts which might affect the outcome of the pending action under governing law. *See Anderson*, 477 U.S. at 248. Genuine disputes are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and must produce evidence sufficient to establish the existence of the elements essential to his case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence is insufficient to create a factual dispute. *See Anderson*, 477 U.S. at 252. In ruling on a motion for summary judgment, the court may not weigh the evidence or make credibility determinations. *Id.* at 248.

Section 1983 Standard

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that

REPORT AND RECOMMENDATION
PAGE - 6

1    caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing

2    *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

3                                            <u>Excessive Force</u>

4          Plaintiff asserts in his complaint that defendants used excessive force against him while

5    removing him from his bed and placing him in a restraint chair on April 10, 2016, and that this

6    conduct violated his right under the Eighth Amendment to be free from cruel and unusual

7    punishment. (Dkt. 9 at 3-5.) However, because plaintiff was a pretrial detainee at the time his

8    claims arose, his reliance on the Eighth Amendment is misplaced.

9          The United States Supreme Court has made clear that "the Due Process Clause protects a

10   pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*,

11   490 U.S. 386, 395 n. 10 (1989).  And, the Ninth Circuit has determined that "the Fourth

12   Amendment sets the 'applicable constitutional limitations' for considering claims of excessive

13   force during pretrial detention." *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002)

14   (citing *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996)).  Thus, plaintiff's claim

15   of excessive force must be evaluated under the Fourth Amendment's objective reasonableness

16   standard. *Pierce*, 76 F.3d at 1043.

17         In *Graham*, the Supreme Court explained that determining whether a particular use of force

18   was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and

19   quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

20   governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotations omitted).  Among

21   the factors that must be considered in evaluating a claim of excessive force are "whether the

22   suspect poses an immediate threat to the safety of the officers or others," and "whether he is

23   actively resisting." *Id*.  *See also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th

REPORT AND RECOMMENDATION
PAGE - 7

1    Cir. 2001).  The Supreme Court made clear in *Graham* that "[t]he 'reasonableness' of a particular

2    use of force must be judged from the perspective of a reasonable officer on the scene rather than

3    with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

4         Defendants argue in their summary judgment motion that the level of force used against

5    plaintiff on the date in question was reasonable in light of KCCF's legitimate penological interests

6    in officer and inmate safety, and institutional security.  (*See* Dkt. 34 at 8.)  The record supports

7    this argument.  The evidence submitted by defendants in support of their summary judgment

8    motion, which plaintiff has made no effort to rebut, demonstrates that plaintiff was volatile,

9    agitated and uncooperative when he arrived at KCCF the day prior to the alleged assault by

10    corrections staff, and that he remained aggressive and uncooperative throughout the booking

11    process.  (*See* Dkt. 39-1 at 26-32.)

12         When corrections staff contacted plaintiff on April 10, 2016 in order to effectuate his

13    transfer to another housing unit, he was uncooperative and verbally abusive.  (*See id*. at 2-11.)

14    While plaintiff maintains that he was asleep in his cell at the time officers entered and was not

15    causing any trouble (*see* Dkt. 9 at 4), the record evidence flatly refutes that assertion.  The evidence

16    establishes that plaintiff was not sleeping, but was instead hiding under his blanket while cursing

17    at officers and ignoring directives that he change into his jail issued uniform for transfer to an

18    appropriate housing unit.  (*See* Dkt. 35 at 2.)  It was this behavior which caused officers to enter

19    plaintiff's cell and physically extract him.

20         Once officers entered the cell, plaintiff's continued resistance to efforts to handcuff him

21    led Officer Poe to activate the stun shield he was using to pin plaintiff to the bed, though this

22    activation was relatively brief.  (*See* Dkt. 36 at 2.)  After the stun shield was activated, plaintiff

23    finally put his hands behind his back for cuffing.  (*See id*.)  Plaintiff was then escorted to the

REPORT AND RECOMMENDATION
PAGE - 8

restraint chair using a "bent arm bar technique," a low level strength technique which is used to escort or gain control of uncooperative inmates.  (*Id.*)  Once seated in the chair, the restraints were applied and plaintiff was transported with no further incident.  (*See id.* at 2-3.)

There is no evidence that plaintiff suffered any injury commensurate with being slammed into the ground or into the restraint chair as plaintiff alleges.  The only apparent injury was to plaintiff's toes as a result of the foot trap employed by Acting Sergeant Drake while securing plaintiff in the chair.  Given plaintiff's volatile and uncooperative behavior over the course of two days at KCCF, utilization of the foot trap in an effort to ensure the safety of the officers was well within the scope of what would be considered reasonable under the circumstances facing officers at that time.  In sum, the record demonstrates that officers acted reasonably in extracting plaintiff from his cell, and employed a reasonable amount of force.  Plaintiff has made no showing to the contrary.  This Court therefore concludes that plaintiff has established no violation of a federally protected right and that defendants are therefore entitled to summary judgment with respect to plaintiff's excessive force claim.

Inadequate Medical Care

In addition to his claims of excessive force, plaintiff also asserts in his complaint that he sent a kite requesting medical assistance for the injuries suffered in the use of force incident, but was never called to the clinic.  (Dkt. 9 at 3.)  Defendants argue in their motion for summary judgment that plaintiff has failed to set forth facts supporting a viable claim of denial of medical care.  (Dkt. 34 at 13-14.)  It is not entirely clearly that plaintiff intended to assert a claim for denial of adequate medical care in his complaint.  However, assuming he did, the claim is easily disposed of.  As noted above, in order to adequately state a claim for relief under § 1983, a plaintiff must demonstrate that the named defendants personally participated in causing the harm alleged.

REPORT AND RECOMMENDATION
PAGE - 9

Plaintiff does not allege that the named defendants were responsible for responding to his medical kite or that they interfered in any way with his ability to receive medical treatment. The absence of any facts connecting the alleged denial of medical care to the five named defendants is fatal to any such claim. Accordingly, any intended claim regarding the denial of medical care should be dismissed for failure of plaintiff to adequately allege a cause of action under § 1983.

CONCLUSION

For the foregoing reasons, this Court recommends that defendants' motion for summary judgment be granted and that plaintiff's complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

DEADLINE FOR OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 21, 2017**.

DATED this 24th day of March, 2017.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 10